**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CRICKET WIRELESS LLC, AT&T MOBILITY, LLC, and AT&T Intellectual Property II, L.P.<br><br>        Plaintiffs,<br><br>   v.<br><br>CELLNTELL DISTRIBUTION INC., a Canadian corporation; CNT WIRELESS LLC, a New York limited liability company; SAJID BUTT, an individual, and John Does 1-20,<br><br>        Defendants. | Civil Action No. |

<u>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**</u>

**JURY TRIAL DEMANDED**

Raymond O. Aghaian (CA Bar No. 218294)
Byron R. Chin (CA Bar No. 259846)
*Pro hac vice applications forthcoming*
KILPATRICK TOWNSEND & STOCKTON LLP
9720 Wilshire Blvd PH
Beverly Hills, CA 90212-2018
Telephone:  (310) 248-3830
Facsimile:  (310) 860-0363
Email:  raghaian@kilpatricktownsend.com
       bchin@kilpatricktownsend.com

Jonathan E. Polonsky (JP5877)
David V. Mignardi (DM4090)
KILPATRICK TOWNSEND & STOCKTON LLP
The Grace Building 1114 Avenue of the Americas
New York, New York USA 10036
Telephone: (215) 775-8786
Facsimile: (212) 214-0341
Email: jpolonsky@kilpatricktownsend.com
      dmignardi@kilpatricktownsend.com

[Additional counsel listed on signature page]
*Attorneys for Plaintiffs*

## PARTIES

Plaintiffs Cricket Wireless LLC ("Cricket" or "Cricket Wireless"), AT&T Mobility LLC ("AT&T PREPAID") and AT&T Intellectual Property II, L.P. (collectively "AT&T" or "Plaintiffs"), hereby file this Complaint for Damages and Injunctive Relief against Defendants CellnTell Distribution Inc., ("CellnTell"), CNT Wireless LLC ("CNT"), Sajid Butt, and John Does 1-20 (collectively "Defendants") and state:

1.      Cricket Wireless LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Blvd. NE, Atlanta, Georgia, 30319.

2.      AT&T Mobility LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard, NE, Atlanta, Georgia 30319.

3.      AT&T Intellectual Property II, L.P. is a Nevada limited partnership with its principal place of business at 1025 Lenox Park Blvd. NE, Atlanta, Georgia, 30319.

4.      Defendant CellNTell is a Canadian corporation with a registered business address at 401 Traders Blvd, Unit #1, Mississauga, ON L4Z 2H8.

5.      Defendant CNT is a New York limited liability company with a registered business address of 790 Dodge Road, Getzville, NY 14068.  Upon information and belief, CNT is a fully-owned subsidiary and agent of CellnTell.

6.      Upon information and belief, Defendant Sajid Butt ("Butt") is an individual who is a Canadian citizen, residing at 708 Casarin Crescent, Milton, ON, L95 2W3.  Upon information and belief, Mr. Butt is the owner and principal of CellnTell, and also the owner and principal of CNT Wireless.  Upon information and belief, Mr. Butt is the owner and registrant of the website anyphoneunlocking.com.

7.      Upon information and belief, Defendants John Does 1-20 are individuals and co-conspirators who participate in other aspects of the Prepaid Phone Trafficking Conspiracy set forth below, including but not limited to purchasing and reselling AT&T Phones, obtaining and supplying unlocking codes, providing phone unlocking services, and/or reselling and shipping AT&T Phones overseas.

## JURISDICTION AND VENUE

8.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because AT&T's claims for violation of the United States Trademark Act, Title 15 of the United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq., and the United States Copyright Act, Title 17 of the United States Code arise under federal law.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over AT&T's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.  This Court also has jurisdiction because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest.

9.      Defendant CNT is subject to the personal jurisdiction of this Court because it is a New York company with its principal place of business in the State of New York.

10.     Defendant CellnTell is subject to the personal jurisdiction of this Court because it has conducted and engaged in regular business ventures within the Southern District of New York.  Specifically, on information and belief, CellnTell is subject to general personal jurisdiction in this Court due to its agency relationship with its fully-owned New York subsidiary, CNT.  CNT represents on its website that it is "a subsidiary of Celln[T]ell," and all hyperlinks on the CNT webpage lead to the CellnTell website.  CellnTell is also subject to specific personal jurisdiction in this Court because it has transacted business in the Southern

District of New York, and committed tortious acts causing injury to persons or property within the Southern District of New York, including the specific tortious acts alleged herein related to unlawfully reselling new, unlocked AT&T Phones to AT&T's undercover investigators, as set forth in greater detail below.  CellnTell has repeatedly advertised large quantities of new, unlocked prepaid phones available for sale in New York, including AT&T Phones.  CellnTell has also repeatedly advertised its intention to expand its sales in the United States market, exhibited at trade shows located in San Francisco and Los Angeles, California and Las Vegas, Nevada.  On information and belief, CellnTell also acquired new, unlocked AT&T Phones from various retail stores located in the United States, such as Walmart and Target stores in Texas and Illinois, and subsequently resold these Phones to AT&T's undercover investigators, shipping some of them to the investigators at an address the Southern District of New York and the remainder to the investigators at an address in Florida.

11.     Mr. Butt is the subject to the personal jurisdiction of this Court because he has, on behalf of CellnTell and CNT, conducted, engaged in and carried out business ventures within the Southern District of New York, committed tortious acts within the Southern District of New York, and has engaged in substantial and not isolated commercial and tortious activity within the Southern District of New York.  These acts include the business activities mentioned in the preceding paragraphs which Mr. Butt engaged in on behalf of CNT and CellnTell.  In addition, upon information and belief, Mr. Butt also offered and provided prepaid phone unlocking services to persons within the Southern District of New York through his website anyphoneunlocking.com.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants either reside in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## NATURE OF ACTION

13.     AT&T PREPAID™ (f/k/a AT&T GoPhone) sells new prepaid wireless phones and other mobile devices under the AT&T brand.  Cricket Wireless sells new prepaid wireless phones and other mobile devices under the Cricket brand.  These devices (collectively "AT&T Phones" or "Phones") are intended for use with SIM cards from the AT&T Mobility or Cricket Wireless networks (collectively, the "AT&T Authorized Networks"), and are sold at prices lower than the wholesale price of the Phones as sold to AT&T to make them more widely accessible to consumers.  The Phones are physically branded with AT&T's registered trademarks and are preloaded with AT&T proprietary software.  AT&T sells its Phones directly from the AT&T PREPAID and Cricket Wireless websites, through authorized AT&T and Cricket dealers ("Authorized Dealers"), and through AT&T approved national retail chains such as Best Buy, Walmart, or Target ("National Retailers").

14.     Defendants and their co-conspirators are perpetrators of an unlawful conspiracy (the "Conspiracy" or "Prepaid Phone Trafficking Conspiracy") to profit from the illegal acquisition and resale of new bulk AT&T Phones by misappropriating the substantial financial investment that AT&T makes in its Phones, and converting that investment for their own profit and to the detriment of AT&T and its customers.

15.     Upon information and belief, the Prepaid Phone Trafficking Conspiracy involves Defendants and their co-conspirators directly or indirectly acquiring new AT&T Phones originally sold at National Retailers and/or at AT&T and Cricket Authorized Dealers.

5

Defendants then offer for sale AT&T Phones that they represent to be new.  As part of this Conspiracy, the Phones, which may be purchased and resold multiple times, are ultimately resold to someone other than the consumer with whom AT&T has a business relationship.  These Phones are not activated on an AT&T Authorized Network.  Instead, a central feature to the Defendants' actions in the Conspiracy involves either circumventing, or causing to circumvent, a technological protection measure to either sell the Phones as already unlocked, or by providing the purchaser with an unlock code specific for each individual AT&T Phone for permanently unlocking the phone.  Once the new Phones are unlocked, they can operate on other carriers' wireless networks.  Upon information and belief, the ultimate users of the Phones may even be located overseas, in a country where the wireless service provider does not subsidize the cost of new phones.

16.     Defendants' Prepaid Phone Trafficking Conspiracy takes advantage of AT&T's investment in its Phones to reduce the costs for its consumers.  Defendants directly or indirectly obtain, and conspire to obtain the new AT&T Phones under false or fraudulent pretenses that they will be utilizing the phones on the AT&T Authorized Networks, but then unlock and resell or divert them to other markets.  The Prepaid Phone Trafficking Conspiracy converts AT&T's investment dollars into substantial profits for Defendants and their co-conspirators.  In addition, Phones resold by Defendants are materially different from AT&T Phones sold through legitimate channels, as they are unlocked, and/or sold without warranty information, original packaging and accessories, and other material.  While Defendants' role in the Conspiracy may not involve each step of the Conspiracy, each of Defendants' acts is a violation of AT&T's rights and causes significant damage to AT&T.  Additionally, as participants in the conspiracy, Defendants are liable for the harm caused to AT&T by the entire Conspiracy.

17.     The Prepaid Phone Trafficking Conspiracy causes tremendous harm to AT&T and to consumers.  In addition to the pecuniary losses caused by Defendants' conversion of AT&T Phones, investment in the Phones, lost sales and market expenses, and lost expected customer revenue, Defendants' misconduct has harmed AT&T's relationships with its customers, Authorized Dealers, National Retailers, and others.  Defendants' Prepaid Phone Trafficking Conspiracy also involves unlawfully accessing AT&T's protected computers; trafficking of AT&T's protected and confidential computer passwords; willful infringement of AT&T's trademarks; and/or misappropriating AT&T's investment in subsidizing new mobile devices. AT&T Phones fraudulently acquired and resold under Defendants' Prepaid Phone Trafficking Conspiracy have caused substantial damage to AT&T's brand, image and reputation.

18.     AT&T seeks to recover damages for the harm caused by Defendants' Prepaid Phone Trafficking Conspiracy, and to obtain an injunction prohibiting Defendants from continuing to perpetrate the Prepaid Phone Trafficking Conspiracy.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**I.     AT&T's Prepaid Phone Business**

19.     AT&T is one of the largest providers of prepaid wireless service in the United States, and markets its service under the AT&T PREPAID and Cricket marks.  AT&T currently serves millions of customers nationwide and has developed a highly regarded business reputation in the public and amongst its customers for deploying innovative technologies and services for its customers.

20.     AT&T PREPAID and Cricket customers can choose from a variety of prepaid monthly voice and data plans for use on cutting edge devices on the AT&T Mobility or Cricket Wireless networks.  In addition to availability online and over the phone through authorized

customer service representatives, AT&T Phones and wireless service are sold through
Authorized Dealers and National Retailers across the country.

21.     AT&T's prepaid business model depends on AT&T's ability to deliver high-
quality phones at affordable prices.  AT&T sells the Phones for substantially less than what
AT&T pays to the manufacturers for the Phones in order to attract legitimate customers of
AT&T Phones for use on the AT&T Mobility or Cricket Wireless networks.

22.     AT&T is able to subsidize the cost of the Phones based on expected wireless
service revenue.  Except in limited circumstances not applicable here, AT&T Phones must be
used on an AT&T Authorized Network for the first six months after activation (the "AT&T
Service Period") before they can be legitimately unlocked by AT&T and used on any other
network.  Each of the prepaid AT&T Phones are locked to the AT&T Authorized Networks until
unlocked.

23.     In addition to subsidizing AT&T Phones, AT&T also offers discounts, rebates,
and other incentive programs to its customers, such as discounts for customers who are
transferring an existing phone number, or discounts to customers who add additional lines for
friends and family on the same account.  Upon information and belief, telecommunications
carriers outside the United States do not offer substantial subsidies and investment programs.
Instead, their consumers must pay the full price for the phones to purchase the phone from
manufacturers.

24.     AT&T requires its customers to review and agree to Terms and Conditions when
using AT&T Phones.  The Terms and Conditions are a valid and binding contract between
AT&T and each of its customers.  As set forth below, the packaging for prepaid AT&T Phones
provides notice of the Terms and Conditions, directs customers to the full text of the Terms and

Conditions, and indicates that by purchasing an AT&T Phone, they are agreeing to comply with the conditions set forth in the Terms and Conditions.

25.     AT&T's business model in offering its customers Phones at substantially reduced prices is viable only if the Phones are activated and used as intended on an AT&T Authorized Network during the AT&T Service Period.  AT&T requires manufacturers that produce wireless phones for AT&T to install software known as a "SIM Lock" on the AT&T Phones.  This SIM Lock is intended to prevent the Phones from being accessed or used outside the AT&T Authorized Networks during the AT&T Service Period unless AT&T receives a valid request from a legitimate AT&T customer, and unlocks the Phone or provides the customer with an unlock code.

26.     To maintain its standing as a leader in a competitive industry, AT&T expends substantial resources to provide its vast and reliable nationwide wireless network, and to ensure that its customers are able to acquire high-quality phones at affordable prices for use on the AT&T Authorized Networks.  AT&T prepaid phone subsidies and discounts are essential to AT&T's ability to offer affordable, high-quality phones to its customers.  In turn, to be able to offer such subsidies and support its wireless network, AT&T depends on legitimate customers activating and using their Phones on AT&T Authorized Networks during the AT&T Service Period.

## II.    AT&T's Trademarks

27.     AT&T owns federal trademark registrations for the standard character and stylized AT&T®, GOPHONE®, and Cricket® marks for a wide variety of goods and services, including telecommunications services and cellular telephones, as depicted below:

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
| **GO PHONE** | Reg. No. 1556587 | 09/19/1989 | Cl. 09: Cellular telephones |
| **GO PHONE** | Reg. No. 2048570 | 04/01/1997 | Cl. 38: Telecommunications services, namely electronic transmission of messages, voice messages, information and data; paging services; electronic audio and/or audiovisual voice messaging services, namely the recording, storage and subsequent transmission of audio and/or audiovisual voice messages in digital format |
| **GOPHONE** | Reg. No. 2911779 | 12/14/2004 | Cl. 38: Telecommunications services, namely electronic transmission of messages, voice messages, information and data; paging services; electronic audio and/or audiovisual voice messaging services, namely the recording, storage and subsequent transmission of audio and/or audiovisual voice messages in digital format |
| **CRICKET** | Reg. No. 2359369 | 06/20/2000 | Cl. 38: Telecommunications services, namely offering personal communications services via wireless networks; and providing cellular telephone services and personal communication network (PCN) services |
| **AT&T** | Reg. No. 3884434 | 11/30/2010 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, 45, including telecommunications services, telephones, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services, |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
| **AT&T GOPHONE** | Reg. No. 4049377 | 11/01/2011 | Cl. 38: Telecommunications services, namely wireless transmission, uploading and downloading of voice, data, images, audio, video, signals, software, information, games, ring tones and messages; wireless telephone services; providing wireless calling plans; wireless voice messaging services; wireless text and numeric digital messaging services; wireless roaming services |
|  | Reg. No. 4785913 | 08/04/2015 | A wide variety of goods and services in Classes 9 and 38, including mobile phones, smartphones, tablet computers, wireless communication device featuring voice, data and image transmission including voice, text and picture messaging, cell phone accessories, namely cases, cables, holsters, memory cards, car chargers, wall chargers and screen protectors, and telecommunications services, namely wireless telephone services |
|  | Reg. No. 4773093 | 07/14/2015 | A wide variety of goods and services in Classes 9 and 38, including mobile phones, smartphones, tablet computers, wireless communication device featuring voice, data and image transmission including voice, text and picture messaging, cell phone accessories, namely cases, cables, holsters, memory cards, car chargers, wall chargers and screen protectors, and telecommunications services, namely wireless telephone services |

11

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
|  | App. No. 86725288 | 08/14/2015 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, and 45, including telephones, mobile telephones, telecommunications products, hardware for use in wireless communications systems, computer software for use in accessing the global computer network, telephone accessories, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services |
|  | App. No. 86725293 | 08/14/2015 | A wide variety of goods and services in Classes 9, 16, 35, 36, 37, 38, 41, 42, and 45, including telephones, mobile telephones, telecommunications products, hardware for use in wireless communications systems, computer software for use in accessing the global computer network, telephone accessories, high-speed and dedicated access to the internet, private line voice, text, facsimile, and video and data telecommunications services |
|  | App No. 86725298 | 08/14/2015 | A wide variety of goods and services in Classes 8, 9, 10, 11, 12, 14, 16, 18, 21, 24, 25, 28, 36, 37, 38, 41, and 42, including speakerphones, car chargers for cell phones, digital photo and video cameras, cell phone faceplates, hands-free devices and carrying clips for wireless telephones and handheld mobile digital electronic devices for the sending and receiving of telephone calls, protective covers, screens and cases for cell phones, screen protectors for cell phones and computers, subscriber identity module (SIM) cards for cellular telephones |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
|  | App. No. 86725313 | 08/14/2015 | A wide variety of goods and services in Classes 8, 9, 10, 11, 12, 14, 16, 18, 21, 24, 25, 28, 36, and 42, including speakerphones, car chargers for cell phones, digital photo and video cameras, cell phone faceplates, hands-free devices and carrying clips for wireless telephones and handheld mobile digital electronic devices for the sending and receiving of telephone calls, protective covers, screens and cases for cell phones, screen protectors for cell phones and computers, subscriber identity module (SIM) cards for cellular telephones |
|  | App. No. 87878075 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |
|  | App. No. 87878227 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |

| Trademark | Reg. or App. No. | Reg. or App. Date | Goods and Services |
|---|---|---|---|
|  | App No. 87878273 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |
|  | App. No. 87878290 | 04/16/2018 | Cl. 35: Retail store services and online retail store services all featuring telephones, wireless hand-held devices for access to global computer networks, handheld mobile digital electronic devices and other consumer electronics, personal computers, tablet computers, carrying cases for telephones, wireless and handheld devices, wireless and corded headsets, chargers, batteries and home security and automation systems |

28.     AT&T owns common law rights in the AT&T PREPAID and Cricket character marks, which have been used in commerce in the United States since at least July 2017 and March 2014 respectively, on and in connection with its telecommunications products and services, including AT&T Phones.  Collectively, AT&T's registered and common law marks are referred to as the "AT&T Marks."

29.     AT&T protects the AT&T Marks, which are the property of AT&T.  The AT&T Marks are an essential and fundamental part of the identity, and goodwill developed by AT&T. AT&T has spent enormous amounts of time, money, and effort advertising and promoting the products and services with which the AT&T Marks are used.  Only AT&T and those it has expressly authorized are permitted to use the AT&T Marks.  The AT&T Marks are valid,

14

distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with AT&T.

30.    Defendants are not affiliated with AT&T, are not AT&T Authorized Dealers or AT&T approved National Retailers, and are not otherwise expressly or implicitly permitted to use the AT&T Marks.

**III.    AT&T's Proprietary Software**

31.    AT&T creates and develops proprietary software ("AT&T Software") in conjunction with manufacturers of AT&T Phones, wherein manufacturers develop software applications at AT&T's direction, using AT&T's proprietary intellectual property, design elements, specifications, and requirements.

32.    Copies of the AT&T Software are preinstalled on every AT&T Phone in the phone's firmware, and in the baseband software.  Unlike third-party applications that an end-user downloads from the Internet, the AT&T Software cannot ordinarily be removed from an AT&T Phone by an end-user without unauthorized technical modifications.  Representative examples of such AT&T Software include the myCricket application preinstalled on Cricket Wireless branded Phones, and the myAT&T application preinstalled on AT&T PREPAID branded Phones.

33.    Copies of the AT&T Software on AT&T Phones are never sold to purchasers of AT&T Phones.  Instead, AT&T grants non-exclusive, non-transferable licenses to use the AT&T Software to individual purchasers who accept End User License Agreements ("EULAs"), and/or through the Terms and Conditions referenced in the following section.  Copies of these EULAs are attached as Exhibit 1.  AT&T does not authorize any person who does not accept and comply with the terms of these EULAs to access or otherwise use copies of AT&T Software.

**IV.**   **AT&T Prepaid Phone Terms and Conditions**

34.     As set forth above, AT&T Phones are sold under the Cricket and AT&T

PREPAID brands.  Cricket Wireless branded Phones are sold subject to terms and conditions

("Terms and Conditions") which conspicuously restrict and limit the sale and use of the Phones.

A copy of the Cricket Wireless Terms and Conditions of Service ("Cricket Terms") is attached

as Exhibit 2.  These Cricket Terms are set forth in printed inserts that are included in the

packaging with for Cricket Phones sold at National Retailers, and are also available to the public

on the Cricket Wireless website.  They are also referenced in printed warnings that are placed on

the outside of the National Retailer packaging of the Cricket Phones.  The Cricket Terms and

language on the packaging constitute a valid binding contract.

35.     The National Retailer packaging in which new Cricket Phones are sold contains

the following language that is printed on the outside of the package:

> This phone may only be used with Cricket service for the first six
> months after activation.  By purchasing, activating or using this
> phone or Cricket service you acknowledge and agree to the Terms
> and Conditions of Service available inside this package or at
> www.cricketwireless.com, which contains important information,
> including your agreement to dispute resolution by binding
> individual arbitration instead of jury trials or class actions.

36.     Similarly, customers at Cricket Wireless Authorized Dealers are presented with

the Terms and Conditions under which they are receiving service and devices at the time they

activate service and customers must accept those Terms and Conditions before finalizing their

transaction.  Additionally, the Terms and Conditions are included in each Authorized Dealer

device package.

37.     The Cricket Terms included in the Cricket Phone packaging also provide, in

pertinent part, as follows:

You [] agree that you will not make, nor will you assist others to make, any modifications to any Device you purchase from Cricket or programming to enable it to operate on any other system or network except in accordance with our Device Unlocking Policy found at www.cricketwireless.com/legal-info/device-unlock-policy.html. You understand and acknowledge that Devices you purchase from Cricket are sold solely for use with our network and that we will be significantly damaged if you use or assist others to use our Devices for any other purpose.

…

When you purchase, activate or use our Services or any Devices you agree that you will not misuse or abuse our Services or Devices by doing, among other things, any of the following: (a) purchasing a Device without intending to activate or use it on our network; (b) reselling or rebilling our Services, or reselling Devices purchased from Cricket; … [or] (e) using our Services or any Devices for any fraudulent or unlawful purpose[.]

38.    The AT&T PREPAID Phones at issue here are also sold subject to terms and conditions which conspicuously restrict and limit the sale and use of the Phones.  A copy of the AT&T PREPAID Plan Terms and Terms of Service ("AT&T PREPAID Terms") are attached as Exhibit 3.  These AT&T PREPAID Terms are referenced in printed warnings that are placed on the outside of the packaging of every AT&T PREPAID Phone sold at National Retailers and Authorized Dealers, also referenced in a printed Quick Start Guide that is included in the packaging with every AT&T PREPAID Phone, and are also available to the public on AT&T's website.  The AT&T PREPAID Terms constitute a valid binding contract.

39.    The packaging in which new AT&T PREPAID Phones are sold at Authorized Dealers and National Retailers contains the following language that is printed on the outside of the package:

AT&T PREPAID: By activating or using AT&T PREPAID service, you agree to be bound by Terms of Service & Plan Terms available at att.com/prepaidterms. This phone is restricted to AT&T PREPAID service during the first six months after activation and

17

cannot be used with any other carrier's service. Commercial resale is prohibited except by AT&T's authorized agents or retailers.

40.    The Quick Start Guide included in the AT&T PREPAID  Phone packaging for

National Retailers provides, in pertinent part, as follows:

> AT&T PREPAID service is subject to the terms in the AT&T PREPAID Plan Terms & Terms of Service booklet or online at att.com/prepaidterms (both, the "Agreement").  By activating and using AT&T PREPAID service, you agree to be bound by the Agreement.

41.    Similarly, for customers purchasing AT&T PREPAID phones at AT&T

Authorized Dealers, the Terms and Conditions are included in each device package, and after

payment, each customer is provided with a Customer Service Summary document containing a

further reminder of the Terms and Conditions.  A copy of a representative Customer Service

Summary is attached as Exhibit 4.

42.    The AT&T PREPAID Terms provide, in pertinent part, as follows:

> Devices designed for use only on AT&T's network ("Equipment") may not function on other wireless networks.  Equipment is sold exclusively for use with AT&T PREPAID service and may not be resold.  By purchasing such Equipment you agree to activate and use it on AT&T PREPAID service.  You also agree that you will not make, nor will you assist others to make, any modifications to the Equipment or programming to enable the Equipment to operate on any other system.  AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Equipment on other systems.  You understand and acknowledge that the Equipment is sold solely for use with AT&T's prepaid service and that AT&T will be significantly damaged if you use or assist others to use the Equipment for any other purpose.  You agree not to take any action to circumvent limits on the quantity of Equipment that may be purchased.  You will be liable to AT&T for any damages resulting from the conduct prohibited in this section.

43.    The restrictions and limitations in the Cricket Terms and AT&T PREPAID Terms

and on National Retailer packaging are intended to restrict the use of AT&T and Cricket Phones

solely to the AT&T Mobility and Cricket Wireless networks during the AT&T Service Period.

44.     AT&T Phones may access the AT&T Mobility or Cricket Wireless Service only within the United States on all plans, and some plans also include access to roaming networks in Mexico and Canada (the "Coverage Area") during the AT&T Service Period.

45.     During the AT&T Service Period, AT&T PREPAID and Cricket Phones are not authorized to or capable of accessing any cellular network other than the AT&T Mobility or Cricket Wireless networks, respectively, or third party wireless carrier networks with which AT&T has roaming agreements.  AT&T Phones are programmed with a technological protection mechanism known as a "SIM Lock," which checks whether the inserted SIM card contains an approved network configuration.  If the SIM card does not contain an approved network configuration, the SIM Lock causes the phone to display a prompt to enter an unlock code.  The SIM Lock prevents use of the phone on a network other than the AT&T Mobility or Cricket Wireless networks, and also prevents access to the AT&T Software until the correct unlock code is entered.  As set forth in Cricket's Wireless Device Unlock Policy ("Unlock Policy"), AT&T will only provide an unlock code to a customer if the Cricket Wireless Phone: 1) has not been reported lost or stolen, 2) is not associated with a fraudulent account, 3) is designed for use and is locked to the Cricket network, and 4) has been active on the Cricket Wireless network for at least the six-month term of the Cricket Service Period.  A copy of the Cricket Unlock Policy is attached as Exhibit 5.  AT&T PREPAID Phones are subject to the following requirements under the AT&T PREPAID Unlock Policy, a copy of which is attached as Exhibit 6.  As set forth in the AT&T PREPAID Unlock Policy, AT&T will only provide an unlock code to a customer if the device: 1) has not been reported lost or stolen, 2) is not associated with a fraudulent account, and 3) has been active on the AT&T Mobility network for at least the six-month term of the AT&T Service Period.

19

V.     **Defendants' Misconduct**

46.     AT&T has discovered that large quantities of its Phones sold at Authorized

Dealers and National Retailers are not activated for use on the AT&T Mobility or Cricket

Wireless networks.  Defendants and their co-conspirators are fraudulently acquiring, or causing

to be fraudulently acquired, and reselling new AT&T Phones in bulk quantities.  Defendants,

either directly or through their co-conspirators, acquire the Phones under false or fraudulent

pretenses, such as purchasing the Phones from AT&T Authorized Dealers or National Retailers

via misrepresentations that the Phones will be activated and used on an AT&T Authorized

Network.  AT&T Phones acquired by Defendants and their co-conspirators are in fact not

activated on an AT&T Authorized Network.  Instead, without authorization, Defendants and

their co-conspirators either unlock the Phones, or obtain the unlock codes, so that they can be

used on other carriers' wireless networks, and then resell the Phones for a substantial profit.  On

information and belief, some of the Phones are ultimately shipped overseas.  Unlocked Phones

can be used on any network in the United States or foreign carriers, and as a result, Defendants

are able to sell unlocked phones for a higher price than locked phones sold by AT&T and its

Authorized Dealers.

47.     Once an AT&T Phone is unlocked for use with another carrier in the United

States and/or shipped overseas to be used on other wireless networks, AT&T no longer has a

revenue source to recoup its investment on that Phone.

48.     The process of unauthorized unlocking of AT&T Phones involves bypassing the

SIM lock installed in the Phones, circumventing the electronic protections installed in the phone,

which then allows the user of an unlocked phone to access and/or use the AT&T Software under

conditions not authorized by AT&T.

49.     From a casual consumer's perspective, an unlocked AT&T Phone may look physically identical to an unaltered AT&T Phone.  The unlocked Phone is labeled with the same AT&T Marks as new AT&T Phones.  In addition, an unlocked AT&T Phone continues to display AT&T Marks on its screen when it is powered on.

50.     AT&T licenses, but does not sell, the copies of AT&T Software loaded onto AT&T Phones to end users.  Thus, Defendants do not lawfully own any copies of the AT&T Software.  The sole purpose for Defendants' Prepaid Phone Trafficking Conspiracy is for profiting at AT&T's expense and misappropriating AT&T's financial investment in the Phones.

51.     An agreement and conspiracy existed and continues to exist between and among each of the Defendants and their co-conspirators to unlawfully engage in the bulk purchase, trafficking and resale of unlawfully unlocked AT&T Phones under the AT&T Marks.  While the full extent of Defendant's activities in the Prepaid Phone Trafficking Conspiracy is not yet known, Defendants have at least conspired and worked in concert with other individuals to acquire AT&T Phones originally sold at Authorized Dealers or National Retailers, to unlock AT&T Phones and/or to traffic in codes for unlocking AT&T Phones, and to resell the unlocked AT&T Phones to others.

52.     Defendants knowingly agreed to engage, and did engage in one or more overt acts in furtherance of the conspiracy as set forth with more particularity in this Complaint.

53.     AT&T has been proximately damaged by the conspiracy and by Defendants' actions in furtherance of the conspiracy.

54.     As set forth above, Defendants are neither AT&T Authorized Dealers or AT&T approved National Retailers.  Defendants have no legitimate connection to AT&T.

55.     AT&T's undercover investigators began conversations with Sajid Butt from CellnTell in November 2017.  Starting in December 2017, Mr. Butt proposed adding the investigators to a WhatsApp group for receiving advertisements of new, unlocked prepaid phones CellnTell and CNT had for sale.  On February 6, 2018, for example, the investigators received a CellnTell advertisement that advertised that CellnTell had 500 LG Risio 2 Cricket-branded Phones available for sale for $62 each, with unlocking available for $1 per phone.  On March 12, 2018, Mr. Butt sent investigators an advertisement on behalf of CellnTell stating "1200 PC's [AT&T PREPAID] LG PHOENIX 3 - $60, FOB NY," explaining in a follow up conversation with investigators that these devices were brand new, could be unlocked, and were located in the Bronx.

56.     On May 7, 2018, investigators contacted Sajid Butt via text message at his CellnTell phone number.  Mr. Butt agreed to sell 50 new and unlocked Alcatel Xcite AT&T PREPAID-branded Phones for $47 each, and to ship these devices to an address in Staten Island, New York.  Mr. Butt instructed the investigators to pay by wire transfer to a JP Morgan Chase Bank account, which he represented was associated with CNT.  Mr. Butt provided CNT's New York address as contact information for this wire transfer.  Mr. Butt also sent an invoice from CNT Wireless for the phones.  Investigators wired money to CNT's account on May 8, 2018. On May 15, 2018, the investigators received the devices at their Staten Island, New York address.  The package was shipped from CellnTell in Canada, with a customs export declaration completed by Mr. Butt.  The AT&T Phones were new, in their original packaging, and unlocked. These Phones were originally sold at various Walmart stores in Texas to consumers for $29.99 each, thus CellnTell marked up the price by approximately $27 for each of these Phones.

57.     On May 21, 2018, Mr. Butt agreed to sell AT&T's investigators 25 Alcatel Xcite AT&T PREPAID-branded Phones for $47 each, and 25 LG Risio 2 Cricket-branded Phones for $63 each.  Mr. Butt represented that the phones were new, unlocked, and in their original packaging.   AT&T's investigators provided a Florida address for this transaction, and CellnTell shipped the Cricket Phones from CellnTell in Canada to the Florida address investigators provided.  Although Mr. Butt issued an invoice from CellnTell rather than CNT for this transaction, he nevertheless instructed the investigators to wire payment to the same bank account as the prior transaction, which he had previously represented as associated with CNT. The investigators received the shipment of AT&T Phones on June 1, 2018.  The package was shipped from CellnTell in Canada, with a customs export declaration completed by Mr. Butt. The AT&T Phones were new and in their original packaging.  The package contained a sheet of paper with unlock codes for the LG Risio 2 Phones.  The boxes for the Alcatel Xcite Phones were opened, and the phones were already unlocked when the investigators received them.  The Alcatel Xcite Phones were originally sold at various Walmart stores in Texas to consumers for $29.99 each, thus CellnTell marked up the price by approximately $27 for each of these Phones. The LG Risio 2 Phones were originally sold at various Walmart and Target stores throughout the United States to consumers for $49.99 each, thus CellnTell marked up the price by approximately $13 for each of these Phones.

58.     On June 20, 2018, AT&T's investigators initiated a conversation with Mr. Butt via WhatsApp, inquiring whether CellnTell could provide unlock codes for new ZTE Overture 3 and Samsung AMP Prime 2 Cricket-branded Phones.  On June 28, 2018, Mr. Butt directed the investigators to the website anyphoneunlocking.com, which he represented to be his own unlocking website.  After the investigators informed Mr. Butt that they were having difficulty

using his website, Mr. Butt stated that he could provide the codes directly if the investigators sent

payment via PayPal and the relevant device IMEIs they could pay him directly via PayPal and he

could provide the codes directly.  Between July 3, 2018 and July 19, 2018, Mr. Butt sent the

investigators unlock codes for 1 Samsung AMP Prime 2, 7 ZTE Overture 3, and 2 LG Fortune

Cricket Phones.  The investigators paid Mr. Butt $36 total for the unlock codes via PayPal.

**VI.**    **Substantial Harm Caused by Defendants' Misconduct**

59.    Defendants' actions significantly harm AT&T in numerous ways, including *inter*

*alia*: (1) AT&T is unable to recoup its substantial investment in subsidizing AT&T Phones; (2)

AT&T is deprived of the opportunity to earn profits by providing wireless service to legitimate

AT&T consumers during the AT&T Service Period; (3) Defendants' infringement of the AT&T

Marks causes significant ongoing and irreparable losses and harm to AT&T's brand, image, and

reputation;  Defendants' actions seriously and irreparably interfere with AT&T's relationships

with its Authorized Dealers, National Retailers, and customers.  All of these factors undermine

AT&T's competitive edge in the cellular phone industry.

60.    In addition, when AT&T Phones are unlocked and resold by Defendants or their

co-conspirators, AT&T is also harmed because it is no longer able to control the quality of its

product, and because the process of unlocking and reselling an AT&T Phone may void the

manufacturer's warranty on the device.  AT&T assists consumers with manufacturer warranty

service by offering an expedited warranty exchange program.  Because AT&T coordinates

manufacturer warranty service requests for consumers and invests considerable resources in its

warranty exchange program, both consumers and AT&T may be harmed when an AT&T Phone

that has been altered or sold by Defendants or their co-conspirators is submitted to AT&T or the

manufacturer for warranty repair.  AT&T incurs expenses in providing shipping and return

services to consumers who attempt to obtain warranty service for AT&T Phones through

AT&T's warranty exchange program, and in inspecting AT&T Phones that are out of warranty.

Moreover, even if a manufacturer provides warranty service to a consumer with an unlawfully

resold AT&T Phone that should not qualify for warranty service, AT&T still suffers harm

because the manufacturers of AT&T Phones build the cost of warranty repairs into the price that

AT&T pays for each AT&T Phone.  Therefore, providing warranty service to ineligible devices

harms AT&T by increasing the costs it must pay for each AT&T Phone.  Finally, consumers who

purchase AT&T Phones from Defendants without realizing they have been unlawfully unlocked

and resold may turn to AT&T for warranty service in reliance on the AT&T Marks on the

Phones, but be unable to obtain warranty service.

61.    AT&T has also suffered harm from the significant time and effort, and the

associated cost it has spent remedying Defendants' fraudulent actions within the AT&T system

and supply chain.

**VII.    Phone Trafficking is Unlawful**

62.    The unlawfulness of the conduct involved in the Prepaid Phone Trafficking

Conspiracy is widely recognized and acknowledged.

63.    Other wireless providers such as MetroPCS, Sprint Solutions Inc., T-Mobile

USA, Inc., and TracFone Wireless, Inc., have filed multiple lawsuits in numerous federal courts

across the country against other bulk phone traffickers.  Each of those entities has succeeded in

obtaining Final Judgments and Permanent Injunctions, and in enforcing Permanent Injunctions

where needed.

64.    Similarly, although the Unlocking Consumer Choice and Wireless Competition

Act, Pub. L. 113-144 ("Unlocking Act") of 2014 allows the individual owner of a cellular phone

to unlock their phone solely for the legitimate purpose of connecting to a wireless network, the

legislative history makes clear that the Unlocking Act was not intended to authorize prepaid

wireless phone trafficking such as the Prepaid Phone Trafficking Conspiracy.  Indeed, the July

17, 2014 Senate Report, S. Rep. 113-212, states (emphases added):

> Neither of the methods for unlocking recognized by the legislation
> excuses owners from compliance with applicable service
> agreements they may have with the wireless carriers that service
> their phones.   Such agreements may, for example, require
> fulfillment of an applicable postpaid service contract, device
> financing plan, or payment of an applicable early termination fee.
> Moreover, *nothing in the bill permits third parties to unlock devices*
> *independently of the device owner's direction, or for a purpose*
> *other than allowing the owner or a family member to connect to a*
> *new wireless network*. As the Librarian of Congress explained with
> respect to the scope of permissible commercial activity under the
> 2010 determination that is reinstated by the bill, '*the designation of*
> *this class will not benefit those who engage in the type of*
> *commercial activity that is at the heart of the objections of*
> *opponents of the proposed class: the 'bulk resellers' who purchase*
> *new mobile phone handsets at subsidized prices and, without*
> *actually using them on the networks of the carriers who market*
> *those handsets, resell them for profit*.'"

65.     Likewise, in the subsequent October 2015 Section 1201 Rulemaking: Sixth

Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, the Register

of Copyrights specifically noted that "there is also an unlawful form of large-scale unlocking that

involves the bulk purchase of unused handsets that have been offered for sale at subsidized

prices by prepaid wireless carriers, and then unlocking and reselling those handsets for a profit."

The Register also noted that "there was universal agreement that any exemption for cellphones

should be fashioned so as to exclude trafficking activities that seek illegitimately to profit from

subsidies offered by prepaid phone providers."  The Register further noted that past exemptions

for unlocking were also "designed to prevent the 'illegal trafficking of mobile phones.'"  Thus,

the Register recommended that lawful unlocking under the Unlocking Act be limited to "used"

devices, namely, devices that "ha[ve] been lawfully acquired and activated on the wireless telecommunications network of a carrier."

66.     Courts have also consistently held that any modern cellular phone containing an electronic processor to be a computer which is subject to protection against unauthorized access under the Computer Fraud and Abuse Act ("CFAA").  Likewise, Courts have held that unlocking of phone software, and use of proprietary codes to gain access to locked phones can form the basis for a CFAA claim.

## COUNT ONE

### FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114 [§ 32(1) of the Lanham Act]

67.     AT&T reasserts the allegations set forth in Paragraphs 1 through 66 above and Exhibits 1 through 6 as though fully set forth herein.

68.     Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of certain federally-registered AT&T Marks without authorization in connection with their conspiracy to sell and offer for sale of unlocked, materially altered AT&T Phones, which downstream customers will discover have been altered from their original state and may not include the warranties applicable to new, unaltered AT&T Phones.

69.     Defendants' and/or their co-conspirators' use of federally-registered AT&T Marks in connection with the sale of AT&T Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between AT&T and Defendants.

70.     Defendants' and/or their co-conspirators' unauthorized use of certain federally registered AT&T Marks in connection with their participation in the Conspiracy is likely to

continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of AT&T.

71.     Defendants' and/or their co-conspirators' use of certain federally-registered AT&T Marks in connection with the unlocked, materially different AT&T Phones, which may not include the warranties applicable to new, unaltered AT&T Phones, constitutes a misappropriation of AT&T distinguishing and identifying federally-registered trademarks that were created as a result of significant effort and expense by AT&T over a long period of time.

72.     Defendants' and/or their co-conspirators' use of federally-registered AT&T Marks constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with AT&T, and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by AT&T.

73.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, AT&T and the reputation and goodwill of AT&T, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of AT&T.

74.     AT&T is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

75.     Defendants' aforesaid acts constitute willful infringement of AT&T's aforementioned federally registered trademarks in violation of 15 U.S.C. §1114.

## COUNT TWO

### FEDERAL COMMON LAW TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN
### 15 U.S.C. § 1125 (a)(1)(A) [§ 43(a) of the Lanham Act]

76.     AT&T reasserts the allegations set forth in Paragraphs 1 through 75 above and Exhibits 1 through 6 as though fully set forth herein.

77.     Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of at least one of the AT&T Marks without authorization in connection with their conspiracy to sell and offer for sale of unlocked, materially different AT&T Phones, which downstream customers will discover have been altered from their original state, and may not include the warranties applicable to new, unaltered AT&T Phones.

78.     Defendants' and/or their co-conspirators' use of at least one of the AT&T Marks in connection with the sale of unlocked, materially different AT&T Phones has caused, and will further cause, a likelihood of confusion, and mistake and deception as to the source of origin of Defendants' materially altered products.

79.     Defendants' and/or their co-conspirators' unauthorized use of at least one of the AT&T Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of AT&T.

80.     Defendants' and/or their co-conspirators' use of at least one of the AT&T Marks in connection with the unlocked, materially different AT&T Phones, which may not include the warranties applicable to new, unaltered AT&T Phones, constitutes a misappropriation of at least one of the distinguishing and identifying AT&T Marks that was created as a result of significant effort and expense.

81.     Defendants' and/or their co-conspirators' use of at least one of the AT&T Marks constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with AT&T, and thus constitutes false designation of origin and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by AT&T.  Defendants are not affiliated with AT&T in any way.

82.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, AT&T and the reputation and goodwill of AT&T, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of AT&T.

83.     AT&T is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

84.     Defendants' activities constitute false designation of origin and false descriptions and representations in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

85.     AT&T is entitled to appropriate relief as prayed for hereinafter, including preliminary and permanent injunctive relief.

86.     Defendants knew or should have known that Plaintiffs are the owners and/or authorized licensees of the AT&T Marks and that Defendants had no legal right to use any of the AT&T Marks on their infringing products.

87.     Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiffs' lost profits, Defendants' profits, and Plaintiffs' attorneys' fees.

## COUNT THREE

### CONTRIBUTORY TRADEMARK INFRINGEMENT

88.     AT&T reasserts the allegations set forth in Paragraphs 1 through 87 above and Exhibits 1 through 6 as though fully set forth herein.

89.     Defendants knew that their customers intended to resell unlocked AT&T Phones. Defendants also offered their services to customers in unlocking stolen AT&T Phones for resale to the general public as new AT&T Phones.  By misappropriating and using at least one of the AT&T Marks in connection with the Prepaid Phone Trafficking Conspiracy, Defendants knowingly aided and enabled resellers of their products to market them to members of the general public in a way that infringes at least one of the AT&T Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

90.     Defendants' unlawful, unauthorized, and unlicensed sale of the unlocked AT&T Phones has contributed to the creation of express and implied misrepresentations that the AT&T Phones, as sold by Defendants, were created, authorized or approved by AT&T, and include the warranties applicable to new, unaltered AT&T Phones.  Unlocked AT&T Phones sold by Defendant are materially altered and different from AT&T Phones sold directly by AT&T and AT&T Authorized Dealers.

91.     Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers who purchase AT&T Phones altered by Defendants to believe that they are purchasing wireless phones approved by AT&T that qualify for their original warranties.

92.     Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious, and willful.

31

93.     AT&T has been damaged and continues to suffer damages as a result of Defendants' actions.

94.     There is no adequate remedy at law to fully compensate AT&T for the harm Defendants have caused and will continue to cause to AT&T.

## COUNT FOUR

### UNFAIR COMPETITION

95.     AT&T reasserts the allegations set forth in Paragraphs 1 through 94 above and Exhibits 1 through 6 as though fully set forth herein.

96.     Defendants' conduct, directly or through their co-conspirators in acquiring the Phones, unlocking the Phones or providing unlocking codes for the Phones, and reselling the Phones as new for activation on other wireless networks constitutes unfair competition under the common law of the State of New York.

97.     Defendants' conduct reselling, and/or inducing others to resell unlocked AT&T Phones undermines AT&T's subsidized incentive programs, constitutes unfair competition under the common law of the State of New York.

98.     Defendants' use of at least one of the AT&T Marks in connection with the sale of unlocked, materially altered AT&T Phones has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' materially altered products and services, and the relationship between AT&T and Defendants.  Thus, Defendants have also engaged in unfair competition with AT&T in violation of the common law of the State of New York by selling and/or offering, and promoting their products with the intention of trading upon the goodwill established by AT&T and are thereby misappropriating the benefits of

substantial effort and money expended by AT&T in establishing its rights in and to the AT&T Marks.

99.     Defendants' actions were done in bad faith, were intentional, malicious, and willful, and have caused substantial harm to AT&T.

100.    AT&T is entitled to appropriate relief, including injunctive relief.  An award of injunctive relief would provide a benefit to AT&T and a detriment to Defendants in excess of $75,000.

<u>**COUNT FIVE**</u>

**COMMON LAW FRAUD
AND FRAUDULENT MISREPRESENTATION**

101.    AT&T reasserts the allegations set forth in Paragraphs 1 through 100 above and Exhibits 1 through 6 as though fully set forth herein.

102.    As part of the Conspiracy, each of the Defendants, directly or indirectly through other co-conspirators, knowingly and systematically misrepresent to AT&T, Authorized Dealers, and National Retailers that the Phones are being acquired for a legitimate purpose, that the Phones will be used by Defendants or other legitimate consumers on AT&T Authorized Networks, and that they will perform in accordance with the Terms and Conditions.  Moreover, each of the Defendants, directly or indirectly through other co-conspirators, purposefully and knowingly concealed from AT&T, Authorized Dealers, and National Retailers that the Phones are being acquired for an illegitimate purpose and that Defendants and their co-conspirators intend to cause or permit the Phones to be unlocked, resold and used in the improper and unauthorized manners described herein so as to profit illegally at AT&T's expense and also avoid the Terms and Conditions pursuant to which the Phones are sold.  At the time Defendants acquired the AT&T Phones, they were aware that the Phones were acquired for unlocking and

33

resale, that the Phones were intended to be used on a network other than Cricket Wireless or

AT&T Mobility before the end of the AT&T Service Period and that they would not perform in

accordance with the Terms and Conditions.  Defendants acquired the Phones, or otherwise

caused the Phones to be acquired, with the specific intent of unlocking and reselling the Phones

and facilitating the use of the Phones on networks other than AT&T.

103.     On information and belief, each Defendant, directly or indirectly through other

co-conspirators, participated in defrauding AT&T, its legitimate customers, Authorized Dealers,

and National Retailers, to acquire new AT&T Phones, including the specific models identified

herein, for unlocking, resale, and even for shipping overseas.

104.     When Defendants, directly or through their co-conspirators, acquire AT&T

Phones as part of the Conspiracy, they do not intend to use the Phones for a legitimate purpose or

to activate them or maintain them as active on AT&T Authorized Networks, or otherwise

perform in accordance with the Terms and Conditions.

105.     Defendants and their co-conspirators know that they are required to activate the

AT&T Phones for use on an AT&T Authorized Network, pay the monthly service charges, and

otherwise comply with the Terms and Conditions.

106.     Defendants intend for AT&T to rely on their misrepresentations and

concealments, and/or the misrepresentations and concealments of their co-conspirators, to allow

Defendants to acquire and unlock the Phones for improper purposes, including reselling AT&T

Phones for use overseas, or on wireless networks other than the AT&T Authorized Networks in

the United States before the end of the AT&T Service Period.  Defendants specifically facilitated

this fraudulent conspiracy by unlawfully unlocking, or otherwise causing the unlawful unlocking

of the Phones, and thereafter resold the unlawfully unlocked Phones in bulk for a profit without any authorization from AT&T.

107.    AT&T relied on these material misrepresentations in allowing the sale of AT&T Phones for what it believed was a legitimate purpose.  Had AT&T known the truth about Defendants' intentions with respect to the Phones, it would not have sold or permitted the Phones to be sold to Defendants and their coconspirators.  AT&T's reliance on the misrepresentations and concealments of Defendants and their co-conspirators was reasonable under the circumstances.

108.    AT&T has been damaged in excess of $75,000 and continues to suffer damages as a result of Defendants' actions.

109.    Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT SIX

### CONSPIRACY TO COMMIT FRAUD
### AND FRAUDULENT MISREPRESENTATION

110.    AT&T reasserts the allegations set forth in Paragraphs 1 through 109 above, Exhibits 1 through 6, and Paragraphs 115 through 225 below as though fully set forth herein.

111.    An agreement and conspiracy existed and continues to exist between and among the Defendants and other co-conspirators to unlawfully acquire in bulk, traffic, and resell unlawfully unlocked and altered AT&T Phones under at least one of the AT&T Marks, which results in federal common law and statutory trademark infringement, common law unfair competition, contributory trademark infringement, tortious interference with business existing and prospective relationships and existing contracts, unjust enrichment, and violations of the Computer Fraud and Abuse Act, among other things.

35

112.     Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.  As part of the Conspiracy, each of the Defendants, directly or indirectly through other co-conspirators, regularly and systematically misrepresent to AT&T, Authorized Dealers, and National Retailers that the Phones are being acquired for a legitimate purpose, that the Phones will be used by Defendants or other legitimate consumers on AT&T Authorized Networks, and that they will perform in accordance with the Terms and Conditions.

113.     AT&T has been proximately damaged in excess of $75,000 by the conspiracy and Defendants' actions in furtherance thereof.

114.     Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT SEVEN

## TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

115.     AT&T reasserts the allegations set forth in Paragraphs 1 through 114 above and Exhibits 1 through 6 as though fully set forth herein.

116.     AT&T Phones are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

117.     Defendants and their co-conspirators are knowingly trafficking in unlocking code/passwords that effectively control access to AT&T Software and use of the AT&T Phone by offering to the public its alteration service and unauthorized access to the Phone and software for a fee for new AT&T Phones resold to members of the public by Defendants, and also for new, locked AT&T Phones otherwise in the possession of members of the public.

118.    Through the Conspiracy, Defendants are knowingly trafficking in the confidential access codes/passwords with the intent to defraud and harm AT&T by facilitating unauthorized unlocking of AT&T Phones as part of the Prepaid Phone Trafficking Conspiracy.

119.    Defendants' transfer of the Phones and confidential unlocking codes/passwords to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029(e)(5) in that the unlocking codes/passwords were transferred, or otherwise disposed of, to others, or Defendants obtained control of the unlocking codes/passwords with intent to transfer or dispose of them.

120.    Defendants' trafficking of the Phones substantially affects interstate commerce and communication in that the unlocking codes/passwords are trafficked over the internet, throughout the United States, and around the world, and AT&T Phones are used in and affect interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.

121.    Defendants' trafficking of AT&T's unlocking codes/passwords has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one year period.

122.    With respect to loss, AT&T has spent well in excess of $5,000 over a one-year period assessing the damage to AT&T Phones and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

123.    Also with respect to loss, AT&T has spent well in excess of $5,000 over a one year period investigating Defendants' trafficking of unlocking codes/passwords, as well as tracking down fraudulently sold AT&T Phones.

124.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants access protected computers without authorization.

125.    Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

126.    Defendants' conduct is intentional, malicious and willful.

127.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT EIGHT

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)

128.    AT&T reasserts the allegations set forth in Paragraphs 1 through 127 above and Exhibits 1 through 6 as though fully set forth herein.

129.    The manufacturers that produce wireless phones for AT&T install proprietary and confidential software on the AT&T Phones to lock the Phones to AT&T's Authorized Networks and prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks. Except in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period, and has the SIM Lock installed on AT&T Phones to prevent unauthorized access to the proprietary AT&T Software and unauthorized use of the AT&T Phone. Inputting the unlawfully obtained unlocking code of an

AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

130.     AT&T Phones are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

131.     In furtherance of their Conspiracy, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire Phones from AT&T and in so doing void any purchase agreement and any legitimate access to the software and passwords on the AT&T Phones.  As such, Defendants' access to the Phones is not authorized in any way.

132.     Defendants unlawfully access, or otherwise facilitate access, to AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary SIM Lock that is installed in AT&T Phones so that the AT&T Phone will operate on wireless networks other than AT&T Authorized Networks.  Defendants' entry of unlocking codes/passwords into AT&T Phones provides unauthorized access to proprietary AT&T Software and the AT&T Phone by circumventing the SIM Lock.

133.     Defendants' illegal and unauthorized access of AT&T Phones allows them to improperly misappropriate AT&T's investment in its Phones.

134.     Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States, and around the world, and used in and affect interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.

135.    Defendants' unauthorized access, or otherwise facilitation of access, of the AT&T Phones has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one-year period.

136.    With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of AT&T Phones, as well as tracking down fraudulently sold Phones.

137.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed protected AT&T Phones without authorization.

138.    With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its Phones in an amount in excess of $5,000.

139.    Defendants' activities in accessing, or otherwise facilitating access to AT&T Phones without authorization and accessing the proprietary AT&T Software therein constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

140.    Defendants' conduct is intentional, malicious and willful.

141.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one

of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

**COUNT NINE**

**UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD**
**18 U.S.C. § 1030(a)(4)**

142.    AT&T reasserts the allegations set forth in Paragraphs 1 through 141 above and Exhibits 1 through 6 as though fully set forth herein.

143.    The manufacturers that produce wireless phones for AT&T install a proprietary SIM Lock on the AT&T Phones to lock the Phones to AT&T's protected computer networks and prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks. Except in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period, except in specific circumstances not applicable here.  Inputting the unlawfully obtained unlocking code of a AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

144.    AT&T Phones are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

145.    Defendants unlawfully access, or otherwise facilitate access to, AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary software that is installed in AT&T Phones so that the AT&T Phone will operate on other wireless networks.  Defendants' entry of unlocking codes/passwords into AT&T Phones, provides unauthorized access to proprietary AT&T Software.

41

146.    Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of AT&T Phones.

147.    Defendants' access, or otherwise facilitation of access, of the AT&T Phones allows them to improperly steal AT&T's substantial financial investment in its Phones.

148.    Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States, and around the world, are used in and affect interstate commerce and communication, and use wireless telecommunications service pursuant to licenses issued by the Federal Communications Commission.

149.    Defendants' unauthorized access, or otherwise facilitation of access, of AT&T Phones has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one-year period.

150.    Defendants' unauthorized access, or otherwise facilitation of access, of the AT&T Phones has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one-year period.

151.    With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of AT&T Phones, as well as tracking down fraudulently sold Phones.

152.     Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed protected AT&T Phones without authorization.

153.     With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its Phones in an amount in excess of $5,000.

154.     Defendants' activities in accessing, or otherwise facilitating access to, AT&T Phones without authorization and accessing the proprietary AT&T Software therein constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

155.     Defendants' conduct is intentional, fraudulent, malicious and willful.

156.     Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated is at least $5,000 in value.

## COUNT TEN

### OBTAINING INFORMATION FROM A PROTECTED COMPUTER
### 18 U.S.C. § 1030(a)(2)(C)

157.     AT&T reasserts the allegations set forth in Paragraphs 1 through 156 above and Exhibits 1 through 6 as though fully set forth herein.

158.     AT&T Phones are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

43

159.     The manufacturers that produce wireless phones for AT&T install a proprietary SIM Lock on the AT&T Phones to lock the Phones to AT&T's protected computer networks and prevent the Phones from being used outside the Cricket Wireless or AT&T Mobility networks. Except in limited circumstances not applicable here, AT&T does not authorize unlocking of AT&T Phones during the AT&T Service Period.  Inputting the unlawfully obtained unlocking code of an AT&T Phone provides unauthorized access to the proprietary AT&T Software and allows unauthorized use of the AT&T Phone.

160.     Defendants unlawfully access, or otherwise facilitate access to AT&T's protected computers using unlawfully obtained confidential codes/passwords to unlock the AT&T Phone, which requires the manipulation and modification of the proprietary SIM Lock that is installed in AT&T Phones so that the AT&T Phone will operate on other wireless networks.

161.     Defendants use, or otherwise facilitate others to use unlocking codes/passwords to unlock, and thereby obtain unauthorized access to AT&T Phones.  Such unauthorized access therefore allows Defendants or others whom Defendants have assisted to obtain information from a protected computer.

162.     Defendants' unauthorized access, or facilitation thereof, and obtaining of information has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one year period.

163.     With respect to loss, AT&T has spent well in excess of $5,000 over a one-year period assessing unlocked AT&T Phones for damage to prevent future unauthorized access by Defendants and/or their co-conspirators.

164.     Also with respect to loss, AT&T has spent well in excess of $5,000 over a one year period investigating Defendants' intrusions into AT&T's information on AT&T Phones, conducting damage assessment regarding Defendants collection and dissemination of AT&T Phones with the access codes/passwords, as well as tracking down fraudulently sold Phones.

165.     Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants' access AT&T's information contained on protected computers.

166.     Defendants' activities in accessing, or facilitating access to AT&T Phones without authorization and accessing the proprietary AT&T Software therein constitutes unlawfully obtaining information from a protected computer in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C).

167.     Defendants' conduct is intentional, malicious and willful.

168.     Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT ELEVEN

### CIRCUMVENTION OF PROPRIETARY SOFTWARE PROTECTION SYSTEM
### 17 U.S.C. § 1201(a)(1)

169.     AT&T reasserts the allegations set forth in Paragraphs 1 through 168 above and Exhibits 1 through 6 as though fully set forth herein.

170.    The AT&T Phones contain a SIM Lock, a technological measure that in the ordinary course of the measures' operation requires the application of information, or a process or a treatment, with AT&T's authority, to gain access to the proprietary AT&T Software, as set forth in 17 U.S.C. § 1201.

171.    The SIM Lock is a technological measure that effectively controls access to the proprietary AT&T Software.

172.    AT&T did not give Defendants or their co-conspirators authority to unlock, or otherwise to avoid, bypass, remove, disable, deactivate, or impair the technological measures for effectively controlling access to and operation of the AT&T Software.

173.    AT&T did not grant Defendants or their co-conspirators the authority to circumvent the technological measures for effectively controlling access to the AT&T Software.

174.    Defendants are in possession of unlocking codes that avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock that effectively controls access to the proprietary AT&T Software.  Inputting the unlocking code of an AT&T Phone sold by Defendants provides unauthorized access to the proprietary AT&T Software.

175.    Defendants acted, and/or knowingly engaged in a conspiracy, to avoid, bypass, remove, disable, deactivate, or impair a technological measure for effectively controlling access to the proprietary software without AT&T's authority.

176.    Defendants engaged in this misconduct so that their co-conspirators could resell the altered devices in bulk for a profit, and not for the sole purpose of lawfully connecting to a wireless telephone communication network.

177.     Defendants acted to, and/or knowingly engaged in a conspiracy designed to, circumvent a technological measure that effectively controls access to the AT&T Software that is protected under title 17 of the United States Code, and thereby violated 17 U.S.C. § 1201.

178.     Defendants' or their co-conspirators' conduct does not fall within any of the exemptions to 17 U.S.C. § 1201.

179.      Defendants' conduct has caused and, unless enjoined, will continue to cause AT&T severe, immediate, and irreparable injury and damages for which AT&T has no  adequate remedy at law.  AT&T is entitled to injunctive relief restraining such conduct, an award of actual or statutory damages, as well as other equitable and legal relief.

## COUNT TWELVE

### TRAFFICKING IN CIRCUMVENTION TECHNOLOGY
### 17 U.S.C. §§ 1201(a)(2), (b)(1)

180.     AT&T reasserts the allegations set forth in Paragraphs 1 through 179 above and Exhibits 1 through 6 as though fully set forth herein.

181.     Defendants are in possession of unlocking codes that avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock technological measure within the AT&T Phones that effectively controls access to the proprietary AT&T Software.  Inputting the unlawfully obtained unlocking code of a AT&T Phone sold by Defendants provides unauthorized access to the proprietary AT&T Software within the AT&T Phone.

182.     Defendants and their co-conspirators are knowingly trafficking in the service of circumventing the SIM Lock technological measure that protects the AT&T Software from unauthorized access by knowingly transferring to members of the public unlocking codes for AT&T Phones sold by Defendants and also for new, locked AT&T Phones otherwise in the possession of members of the public.

183.    Defendants and their co-conspirators are knowingly trafficking in the service of circumventing the SIM Lock technological measure that effectively controls access to AT&T Software by offering to the public its alteration service for a fee.

184.    Defendants' conduct does not fall within any of the exemptions.

185.    The service provided by Defendants is primarily designed or produced for the purpose of circumventing AT&T's SIM Lock technological measure that effectively controls access to AT&T Software that is protected under title 17 of the United States Code.

186.    The service provided by Defendants has, at most, only a limited commercially significant purpose or use other than circumventing AT&T's SIM Lock technological measure that effectively control access to AT&T Software that is protected under title 17 of the United States Code.

187.    Defendants have violated, and continue to violate, Section 1201 of the Copyright Act, for which AT&T has no adequate remedy at law.  As a result, AT&T has been irreparably injured by Defendants' conduct and will continue to be irreparably injured unless the violating activities of Defendants are enjoined by this Court.

## COUNT THIRTEEN

### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS

188.    AT&T reasserts the allegations set forth in Paragraphs 1 through 187 above and Exhibits 1 through 6 as though fully set forth herein.

189.    A business relationship, and an expectancy of business relationships, exists between AT&T and Authorized Dealers and National Retailers of AT&T Phones.

190.    A business relationship, and an expectancy of business relationships, exists between AT&T and current and prospective AT&T customers.

191.    There is a reasonable likelihood that the abovementioned prospective business relationships would occur but for the unjustified interference of Defendants and/or their co-conspirators.

192.    There is a high probability of future economic benefit to AT&T as a result of these current and prospective business relationships.

193.    Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these current and prospective business relationships between AT&T, Authorized Dealers and National Retailers who sell AT&T products, and legitimate AT&T customers or prospective customers.

194.    Specifically, but without limitation, Defendants knew that AT&T has business relationships, and an expectancy of business relationships, with legitimate consumers of AT&T Phones and wireless service.  Defendants interfered with these relationships by engaging in the Prepaid Phone Trafficking Conspiracy and diverting sales of AT&T Phones from legitimate customers intending to activate the phones on AT&T Authorized Networks.

195.    Defendants also knew that AT&T has business relationships with Authorized Dealers and National Retailers of AT&T Phones to provide them with sufficient quantities of Phones for their legitimate consumers' use exclusively on AT&T Authorized Networks. Defendants' Prepaid Phone Trafficking Conspiracy has resulted in substantial numbers of AT&T Phones that are never activated on AT&T service, thereby substantially harming AT&T and its relationship with its Authorized Dealers and National Retailers.

196.    Defendants also knew that AT&T has business relationships with legitimate AT&T customers to provide them with Phones and service on AT&T Authorized Networks.

197.    Defendants are intentionally and unjustifiably interfering with AT&T's current and prospective business relationships through improper means including fraudulent statements and misrepresentations and stealing legitimate customer purchases, as set forth in detail above, and in violation of the law as set forth in other Counts.  Defendants engaged in the acts of interference.

198.    Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these business relationships and contracts between AT&T, and its Authorized Dealers, National Retailers and legitimate AT&T customers.

199.    Defendants' acts injured AT&T's business relationships.

200.    AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' interference.

201.    Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT FOURTEEN

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

202.    AT&T reasserts the allegations set forth in Paragraphs 1 through 201 above and Exhibits 1 through 6 as though fully set forth herein.

203.    A contractual relationship for a specific term exists between AT&T and Authorized Dealers and National Retailers of AT&T Phones.

204.    A contractual relationship exists between AT&T and its customers, the purchasers of its AT&T Phones and wireless service.

205.    Defendants knew that AT&T has contractual relationships with legitimate consumers of AT&T Phones and wireless service.  Defendants interfered with these relationships by, *inter alia*, inducing purchasers of AT&T products to breach their contracts with AT&T.

206.    Defendants also knew that AT&T has contractual relationships with Authorized Dealers and National Retailers of AT&T Phones under which these Authorized Dealers and National Retailers will promote and sell AT&T products solely for activation on the AT&T Authorized Networks.  On information and belief, Defendants and/or their co-conspirators induce AT&T Authorized Dealers and National Retailers to breach their agreements with AT&T and provide new AT&T Phones to Defendants for a purpose other than activation on AT&T Authorized Networks and at a financial loss to AT&T.

207.    Defendants also knew that AT&T has business relationships with legitimate AT&T customers to provide them with Phones and service on AT&T Authorized Networks.

208.    Defendants are intentionally and unjustifiably interfering with AT&T's existing contracts through improper means including fraudulent statements and misrepresentations and stealing legitimate customer purchases, as set forth in detail above, and in violation of the law as set forth in the other Counts herein.  Defendants tortiously interfered with those AT&T customer contracts by intentionally committing the tortious conduct described herein to cause the termination of the customers' use of the Phones on the AT&T Authorized Networks and the breach of those customer agreements.

209.    Defendants engaged in the acts of interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of their conduct.

210.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these existing contracts between AT&T, and its Authorized Dealers and National Retailers and legitimate AT&T customers.

211.     Defendants' acts injured AT&T's existing contractual relationships.

212.     AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' interference.

213.     Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT FIFTEEN

### UNJUST ENRICHMENT

214.     AT&T reasserts the allegations set forth in Paragraphs 1 through 213 above and Exhibits 1 through 6 as though fully set forth herein.

215.     By obtaining and reselling AT&T Phones at less than AT&T's purchase cost of the Phones for use on wireless networks other than AT&T Authorized Networks, directly and through their co-conspirators, Defendants have obtained benefits in excess of $75,000 from AT&T which have caused significant harm to AT&T and resulted in significant financial gain to Defendants through their resale of the illicitly-acquired new AT&T Phones.

216.     Defendants have knowingly and voluntarily obtained the benefits.

217.     Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying AT&T the value of the benefits Defendants acquired.

## COUNT SIXTEEN

### CONVERSION

218.     AT&T reasserts the allegations set forth in Paragraphs 1 through 217 above and Exhibits 1 through 6 as though fully set forth herein.

219.     Defendants have and are engaged in acts of conversion in violation of the law of the State of New York.

220.     AT&T has the right to provide its Phones and wireless service to the public. Defendants have no such privilege or right.

221.     Defendants knew or should have known that they obtained the Phones through illegitimate means and had no legal right to advertise, use or resell them.

222.     Defendants are wrongfully interfering with AT&T's rights to provide AT&T Phones and wireless service by engaging in the Prepaid Phone Trafficking Conspiracy.

223.     Defendants intentionally and willfully exerted dominion and ownership over the AT&T Phones.

224.     AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' conversion of AT&T's property.

225.     Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

### DEMAND FOR JURY TRIAL

AT&T demands a trial by jury on all triable issues.

WHEREFORE, Plaintiffs Cricket Wireless LLC, AT&T Mobility LLC, and AT&T Intellectual Property II, L.P., respectfully request that this Court enter final judgment and permanent injunctive relief in favor of the Plaintiffs and against Defendants, as follows:

(a)      awarding Plaintiffs their compensatory, consequential, statutory and special damages including, without limitation, their lost profits, Defendants' profits, loss of goodwill and damage to its reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

(b)      awarding Plaintiffs their reasonable attorneys' fees and costs associated with this action;

(c)      granting permanent injunctive relief in favor of Plaintiffs and against Defendants enjoining Defendants from engaging in the unlawful practices described in this Complaint;

(d)      requiring Defendants, pursuant to the Lanham Act to deliver to Plaintiffs their entire inventory of phones and products bearing or infringing the AT&T Marks, a confusingly similar copy thereof; and

(e)      granting such further relief as this Court deems just and proper.

Respectfully submitted this 13th day of September, 2018.

By:  */s/ David V. Mignardi*

Raymond O. Aghaian (CA Bar No. 218294)
Byron R. Chin (CA Bar No. 259846)
*Pro hac vice applications forthcoming*
KILPATRICK TOWNSEND & STOCKTON LLP
9720 Wilshire Blvd PH
Beverly Hills, CA 90212-2018
Telephone:  (310) 248-3830
Facsimile:  (310) 860-0363
Email:  raghaian@kilpatricktownsend.com
          bchin@kilpatricktownsend.com

Jonathan E. Polonsky (JP5877)
David V. Mignardi (DM4090)
KILPATRICK TOWNSEND & STOCKTON LLP
The Grace Building 1114 Avenue of the Americas
New York, New York USA 10036
Telephone: (215) 775-8786
Facsimile: (212) 214-0341
Email: jpolonsky@kilpatricktownsend.com
          dmignardi@kilpatricktownsend.com

Michael J. Breslin (GA Bar No. 142551)
*Pro hac vice application forthcoming*
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: mbreslin@kilpatricktownsend.com

*Attorneys for Plaintiffs*